**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

Lucila Cordova,                    :
                                   :No. 3:17-CV-01009
          Plaintiff,               :
                                   :Judge Richard P. Conaboy
          v.                       :
                                   :
Nancy A. Berryhill[1]              :
Acting Commissioner of             :
Social Security,                   :            **FILED**
                                   :            **SCRANTON**
          Defendant.               :
                                   :            DEC 1 8 2017
                                   :
                                   :            _____
                                   :            Per_____
                                                **DEPUTY CLERK**

**MEMORANDUM**

**I.  Procedural Background**

    We consider here the appeal of Plaintiff Lucila Cordova from

an adverse decision of the Social Security Administration ("SSA" or

"Agency") on her application for Disability Insurance Benefits

---

    [1] Nancy A. Berryhill is now the Acting Commissioner of Social
Security. Pursuant to Rule 25 (d) of the Federal Rules of Civil
Procedure which addresses the substitution of parties when a public
officer is replaced, Nancy A. Berryhill should be substituted for
Acting Commissioner Carolyn W. Colvin as the defendant in this
suit. Fed. R. Civ. P. 25 (d). No further action needs to be taken
to continue this suit by reason of the last sentence of section 205
(g) of the Social Security Act, 42 U.S.C. Section 405 (g), which
states that "[a]ny action instituted in accordance with this
subsection shall survive notwithstanding any change in the person
occupying the office of Commissioner of Social Security or any
vacancy in such office."

1

("DIB") and Supplemental Security Income ("SSI"). Plaintiff's application was denied at the administrative level on September 10, 2017 whereupon she requested a hearing before an administrative law judge ("ALJ"). That hearing was held on April 16, 2015 and it resulted in a written decision dated November 12, 2015 that denied Plaintiff's application once again. Plaintiff then requested review by the Appeals Council. The Appeals Council denied Plaintiff's request and that denial constitutes a final decision by the Agency. This Court now has jurisdiction over this appeal pursuant to 42 U.S.C. § 405(g).

## II.  **Testimony before the ALJ.**

Plaintiff's hearing was conducted on April 16, 2015 in Wilkes Barre, Pennsylvania. Present were the Plaintiff, her attorney, and Gerald Keating, a vocational expert ("VE"). Plaintiff's testimony may be summarized as follows.

Plaintiff was soon to be forty-eight years of age on the date of her hearing. She is not married, has no children, graduated from high school, and holds an associate's degree in Computer Science with specialized training in Web Design. She has a driver's license and receives public assistance and food stamps. (R. 51-52).

Plaintiff has not worked since October of 2012 when a prior application for DIB was denied. She then enrolled in a web design

2

course. Before that she had worked for more than twenty years as a Graphic Designer and Event Coordinator. Some of this employment involved commuting to New York. She has received neither Unemployment Compensation Benefits nor Workers' Compensation Benefits since 2012. (R. 52-54).

She had seen Dr. Lee her Neurosurgeon about one week before the hearing. She had been seeing him periodically since undergoing back surgery in 2013. She saw him at least twice in November and December of 2013 before he directed her to follow up with a Neurologist and a Pain Management Specialist. Approximately six month before her hearing she went to an emergency room due to heart palpations and difficulty breathing. During the ER visit an EKG and several other tests were performed on her. She reported that the tests came back fine and the ER doctors felt her symptoms were neurologically based. Dr. Lee referred her to a pulmonary specialist who was to examine her approximately one month after the hearing. (R. 54-60).

Plaintiff stated that she can dress and take care of her hygienic and grooming needs but that she does require some help. Specifically, she needs help putting her shoes and socks on and, at times, pulling her pants up. When necessary her sister assists her with these activities. She cannot do household chores except for

3

dusting. She does not cook, clean, or do laundry. She reads on the Internet, listens to music, and watches movies or television. She does attend church and shop occasionally in the company of her sister. She could not do these things alone. (R.60-61).

Plaintiff resides in a two story home but lives almost exclusively on the first floor. She testified she does not lift anything heavier that a quart of milk. She can pick light items of clothing off the floor with a "reacher". She cannot sit with her legs dangling because this produces pain in the back of her thighs. She can straighten her left leg completely while seated but cannot do so with her right leg. She can extend her arms forward and can reach overhead. She does not smoke. (R.62).

Plaintiff's routine involves getting up between 8:30 and 9:00 am, and she generally gets to bed by 11:00 pm. Her sleep is interrupted and, despite the fact that she is normally in bed for about ten hours, she estimates that she gets only four to five hours of actual sleep due to "nerve pains in her legs and knees". She states that she can stand for about ten minutes and can remain seated for about thirty minutes before she needs to get up and move around. She can walk unassisted only from one room to another but, with the aid of her assisted device, she can go farther as long as steps are not involved. She states that she does need the device

4

for balance. (R. 62-63).

With respect to medications, Plaintiff testified that she takes Percoset, Gabapentin, and Cyclobenzaprine, and an additional medication that she could not name to alleviate nerve pain, muscle spasms, and tremors. She states that these medication are helpful but do not afford complete relief. She also indicated that a side effect of these medications is frequent drowsiness. (R.64-65).

Plaintiff stated further that, while moving around periodically can alleviate her pain, the best position for her is lying down. She testified that she uses a TENS machine daily at home three times for twenty minutes each time to alleviate her back pain. She finds that trying to do anything physical such as climbing the stairs to shower exacerbates her pain. As a consequence, she goes upstairs only three times each week and requires assistance to do so. Other than these forays to use the shower Plaintiff lives on the first floor of her home. She also uses a heating pad and cold-compresses several times daily to help control her pain. (R. 65-66).

While Plaintiff can extend her arms overhead, she cannot control any objects that she is holding while doing so. She is incapable of doing anything that would require her to place objects on an overhead shelf. Accordingly, she does not do dishes or put

5

them away. She mentioned that she has gained thirty pounds since she filed her application for benefits due to her lack of mobility and steroid use. In addition to her low back pain, she experiences neck pain along with pain that radiates down her arms and into her ring and little fingers. She uses her TENS unit daily to alleviate pain in her neck and shoulder area. Plaintiff also testified that she has a torn meniscus in her right knee and problems with her left knee which further impair her mobility and for which she periodically receives cortisone shots. She added that because she is so unsteady on her feet she must use an assist bar, a shower chair, and a flexible hand-held shower to cleanse herself. (R. 66-70).

VE Gerald Keating also testified. Mr. Keating stated that he had reviewed Plaintiff's work history and was familiar with her educational background. He described her educational status as "high school and above" and described her prior jobs as "sedentary, skilled". Mr. Keating was asked a hypothetical question in which he was to assume a person of Plaintiff's age, education, and past work experience who retains the capacity to perform "light work" with limitations including: standing and walking limited to two hours in an eight hour day; sitting limited to six hours in and eight hour day; no right leg pushing or pulling and only occasional

left leg pushing or pulling; occasional climbing, balancing, stooping, kneeling, crouching and crawling; no work on ladders; no exposure to vibration and hazards; and only occasional bilateral overhead reaching. Based on the hypothetical question the VE stated that such a person could not perform Plaintiff's past work as Event Coordinator but could perform her past work as a Graphic Designer. When the ALJ posed a second hypothetical question to the VE that also asked him to assume, in addition to all the limitations expressed in the first hypothetical question, that Plaintiff would also require unscheduled breaks throughout the workday and be off task 20% of the day the VE stated that such an individual would be unemployable. (R.72-76).

## III. Medical Evidence[2]

### A. Dr. Kamenar

Dr. Elizabeth Kamenar reviewed Plaintiff's medical record in her role as a state agency consultant. She never examined Plaintiff. Her report dated September 10, 2013 noted the Plaintiff's alleged onset of disability date was June 4, 2010. While her analysis indicates that Plaintiff was "unable to

---

[2] In the context of the arguments raised in this appeal, the only relevant medical evidence is the September 10, 2013 Report of State Agency Consultant Elizabeth Kamenar and medical evidence from several providers that postdates Dr. Kamenar's Report while predating the ALJ's decision.

.

7

completely empty bladder" and that she "self catheterizes", the only impairment that Dr. Kamenar noted concerned Plaintiff's spinal disorders.

Dr. Kamenar opined that Plaintiff could: frequently lift up to ten pounds; stand and walk for up to two hours with normal breaks; sit with normal breaks for up to six hours; push and pull hand and foot controls without limitations; occasionally climb stairs; never climb ladders or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never work in extreme cold or high humidity; never work around excessive vibration, moving machinery, or heights; and never be exposed to fumes, odors, dust, gases or poorly ventilated conditions. Based on this assessment, Dr. Kamenar determined that Plaintiff could not perform any of her past relevant work but could work as a lens inserter, nut sorter or sack repairer, and, as such, was not disabled. (R 80-88).

**B. Medical Evidence that Postdates Dr. Kamenar's Report.**

**1. Doctor Holumzer.**

An October 30, 2013 report by Dr. Clinton Holumzer of Good Shepherd Rehabilitation Hospital assessed Plaintiff's condition after she underwent "L2 thru L5 posterior spinal fusion with L3-L4 and L4-L5 disc intervertebral fusions" on October 24, 2013. Dr. Holumzer stated that the surgery was performed because "patient had

8

been experiencing severe progressive back pain, right greater that left, with bilateral lower extremity radiculopathy." Dr. Holumzer noted Plaintiff's history of three previous lumbar surgeries in 1982, 1997, and 2008 and stated "patient is currently experiencing significant decline in strength of the right lower extremity post operatively." Dr. Holumzer also noted: "chronic neurogenic bladder is present. The patient requires self-catheterization four times per day."[3] (R 1485-1488).

## 2. Dr. Mortazavi.

Dr. Steven Mortazavi examined Plaintiff on July 29, 2014. Dr. Mortazavi noted bilateral positive straight leg raising to 70 degrees with acute low back pain. He observed also that Plaintiff walked with a slightly antalgic gait and used a standard cane to ambulate. Dr. Mortazavi also found that Plaintiff's Achilles reflexes were diminished bilaterally and that her Babinski's reflex was downgoing bilaterally. Dr. Mortazavi assessed that a CT scan of Plaintiff's lumbar spine taken on May 19, 2014 indicated "partial

---

[3] Neurogenic bladder is the name given to a number of urinary conditions in people who lack bladder control due to a brain, spinal cord or nerve problem. This nerve damage can be the result of disease such as multiple sclerosis, Parkinson's disease or diabetes. It can also be caused by infection of the brain or spinal cord, heavy metal poisoning, stroke, spinal cord injury, or major pelvic surgery. People who are born with problems of the spinal cord, such as spina bifida, may also have this type of bladder problem.

boney fusion across the L3-L4 and L4-5 disc spaces."
(R 727-730).

### 3. Dr. Christian

On September 8, 2014 Dr. Carese Christian observed that the Plaintiff displayed abnormal gait and gait instability and diagnosed soft tissue pain of the limbs (unspecified) and a medial meniscal tear in her right knee. She referred Plaintiff to physical therapy at LVPG Express Care where Christine Deaner, a licensed physical therapist, noted that Plaintiff was experiencing sharp knee pain with decreased leg strength bilaterally, decreased range of motion, and balance deficits. (R 718-720).

### 4. Dr. Khaltov.

Dr. Dmitry Khaltov upon February 4, 2015 and his assessment of her EMG report indicated bilateral mild to moderate carpal tunnel syndrome Dr. Khaltov adjusted Plaintiff's medications for chronic lumbar pain including morphine sulphate, cyclobenzaprine, and Percoset. Among the medical conditions he verified were acute knee pain, neurogenic bladder, cervical radiculopathy, lumbar radiculopathy and stenosis of the lumbar spine. (R 623- 626).

### IV.  ALJ Decision.

The ALJ's decision (Doc. 9-2 at 23-43) was unfavorable to the Plaintiff. It included the following Findings of Fact and

10

Conclusions of Law:

1. The claimant meets the insured status requirements of the Social Security Act thru December 31, 2015.

2. The Claimant has not engaged in substantial gainful activity since June 4, 2010, the alleged onset date.

3. The claimant has the following severe impairments: degenerative joint disease of the right knee, degenerative disc disease/degenerative joint disease of the cervical and lumbar spine, status post laminectomy and fusion and neurogenic bladder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 404.1520), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of sedentary work, herein treated as sedentary work as defined in 20 CFR 404.1567 (a) and 416.967 (a) in that a claimant could lift and carry ten pounds frequently, the claimant could stand and walk for two hours in an eight hour work day and sit for six hours in an eight hour work day. The claimant could not use the right lower extremity for pushing and pulling and occasionally use the left lower extremity for pushing and pulling. The claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl, but never on ladders. The claimant could perform no more than occasional bilateral overhead reaching. The claimant must

avoid vibrations and hazards.

6. The claimant is capable of performing past relevant work as a graphic designer. This work does not require the performance of work-related activities precluded by the Claimant's residual functional capacity.

7. The claimant has not been under a disability as defined in the Social Security Act, from June 4, 2010, thru the date of this decision.

## V.   **Disability Determination Process.**

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[4]   It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[4] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).   The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.36).

**VI. Standard of Review**

13

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there

15

is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d

Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606

F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B. Plaintiff's Allegations of Error.**

Plaintiff asserts that the ALJ erred in two ways: (1) that her opinion is not based on the requisite substantial medical evidence of record; and (2) that she failed to fully and fairly develop the record by relying exclusively on a temporally distant consultative report by a state agency doctor who did not have the benefit of subsequent medical records that indicated deterioration of Plaintiff's condition. These allegations of error are inextricably intertwined and will be considered as essentially one argument.

The only medical opinion that the ALJ relied upon to craft her assessment of Plaintiff's RFC was the consultative report of Dr. Elizabeth Kamenar produced on September 10, 2013. The ALJ did not produce her written decision until November 12, 2015, some twenty-six months after Dr. Kamenar authored her report. While there is nothing categorically wrong in relying on a temporally remote consultative report, in those instances where subsequent medical

18

records that also predate the ALJ's decision seem to cast suspicion on the validity of the consultative report, the ALJ has an obligation to explain why the subsequent records should be subordinated to the consultative report or to order a second consultative report which passes on the relevance of the more recent medical records. In this case, the ALJ did neither of these things.

In explaining why she accorded "great weight" to the findings of the state agency consultant, the ALJ stated:

The State Agency physical assessment, which limited the claimant to a range of sedentary work with postural and environmental limitations, is given great weight because it is consistent with the treatment history, clinical and diagnostic findings and the activity level of the claimant. Further, it is consistent with the evidence received after the review by the doctor noting no significant change or deterioration in function. Further, the undersigned added additional push, pull and overhead reaching limitations to address the severe and non-severe impairments, as well as subjective complaints to the extent it could reasonably be supported by the record. (Exhibits 1A and 4A).

(R.35). As stated above, the record includes considerable evidence that postdates the State Agency Consultative Report. However, the ALJ's assertion that Dr. Kamenar's assessment "is consistent with the evidence received after the review by the doctor (Kamenar) noting no significant change or deterioration in function" is

factually inaccurate. Dr. Kamenar did not have the benefit of Dr. Holumzer's report concerning Plaintiff's posterior spinal fusion at L2 thru L5 on October 24, 2013. This surgery was Plaintiff's fourth lumbar surgery. Dr. Holumzer also found that Plaintiff's neurogenic bladder had become chronic and this now required that she self-catheterize four times daily. The record contains no previous indication of this frequency of self-catheterization. Because Plaintiff's already well-documented low back problems had required an additional surgery only two months after Dr. Kamenar reviewed her records, the Court finds that this serious surgery coupled with the revelation that Plaintiff now needed to self-catheterize more frequently constituted a significant deterioration of her condition.

Dr. Kamenar was also unaware of Dr. Mortazavi's assessment of Plaintiff on July 29, 2014, an assessment that included positive bilateral leg raise tests, a finding of antalgic gate, and a finding of various diminished reflexes. Dr. Mortazavi's April 22, 2015 letter detailing the Plaintiff's ongoing struggle with persistent pain in her low back and legs, intermittent numbness in her legs, neck pain radiating bilaterally into her shoulders and arms, and long history of bladder incontinence also postdated Dr. Kamenar's review of Plaintiff's medical records. The presence and persistence

of these symptoms long after Dr. Kamenar's report provides evidence of a significant deterioration of Plaintiff's condition.

The totality of the medical evidence that postdates the Kamenar report hints strongly at a significant deterioration in Plaintiff's medical status. The serious surgery of October 24, 2013 produces skepticism about the continuing accuracy of Dr. Kamenar's report. While the date of a non-examining state agency opinion (up to a few years old) is not necessarily an issue, where evidence can be read to indicate that a Plaintiff's condition deteriorated after the state agency physician issued his opinion, it becomes "troubling". See Grimes v. Colvin, CIV. No. 15-113E, 2016 WL 246963, at *2 (W.D.PA. January 21, 2016). See also, Foley V. Barnhart, 432 F.Sup.2nd 465 (M.D.PA. 2005); and Cadillac v. Barnhart, 84 FED. APPX.163 (3rd CIR. 2003).

In light of this subsequent medical evidence which calls into question the continuing reliability of the State Agency physician's consultative report, the ALJ's obligation to fully and fairly develop the record (See Ventura v. Shalala, 55F.3rd 900, 902 (3rd Cir. 1995))is magnified in this case. Indeed, an updated consultative opinion is required if "there is an indication of a change in the claimant's condition that is likely to affect the

ability to work, but the current severity of the claimant's impairment is not established." See 20 CFR §404.1519a (b)(4); also, Robaczewski v. Colvin, 2015 WL 4930115 (M.D.Pa. 2015). In consideration of the need for Plaintiff to undergo a fourth serious lumbar surgery only two months after the consultative report was issued, and also in consideration of record evidence that Plaintiff's chronic neurogenic bladder condition has deteriorated in the interim between the report and the date of the ALJ's decision, it was necessary for the ALJ to procure an updated consultative report before issuing her decision. Thus the Court finds that the record in this case is simply inadequate to determine the propriety of the ALJ's RFC determination in this case. The decision of the Commissioner as it currently stands lacks the substantial evidence to support it. A remand for further development of the record is necessary.

## VIII. Conclusion.

For the reasons cited in the forgoing Memorandum, the Plaintiff's assignments of error are approved and her Appeal is properly granted. This case must be remanded for additional proceedings to assess Plaintiff's residual functional capacity by

resort to all evidence in the record. An Order consistent with this determination will be filed contemporaneously.

**By the Court**

RICHARD P. CONABOY
**United States District Judge**

**DATED:** _____